Mara Enchalouka, Assistant Attorney for the East Coast Justice Department No one ever does. Thank you, Your Honor. Judge Loken, Judge Smith, Judge Cobas, may it please the Court. My name is Mara Enchalouka. I'm here from a small town in Western Nebraska, and I represent the family of Ben Melendez. I took this case fully recognizing that the law in this circuit on state-created danger has much more guidance for what does not rise to the level of conscience-shocking behavior than what does meet that standard. I also took this case recognizing that there was not another exactly like it. It felt like somebody had to speak for this child of God, and so I took the case, and now I am presenting this panel with an opportunity to further develop this circuit's law on state-created danger. 911 dispatchers play a critical role in public safety. If someone in distress calls 911, the dispatcher is the actual first responder. The dispatcher has got to meet the caller in that caller's most urgent moment and give that caller the clarity that's needed to gather information and then send the right kind of help. The time pressures of dispatching are the nature of the job. They're not an excuse for behavior that is provocative or cruel. Over the course of three calls and 34 minutes, the first dispatcher in this case first fought with and provoked a caller that he recognized to be mentally ill. Instead of calming that caller down, he lit the fuse. After the second time that Ben called back, the second dispatcher showed contempt by saying to his colleagues that Ben was nuts. Both dispatchers sent police instead of medical assistance to Ben's house, and they did so without telling police that Ben had made a very specific threat to officer safety. The dispatcher knew that this caller's illness was basically a bomb, and knowingly, he lit his fuse. And that placed Ben in a position of danger, a position of enhanced vulnerability that Ben otherwise wouldn't have faced. And it put that responding officer in terrible danger as well. It was a disaster for both the officer, who was forever traumatized, and for Ben, who lost his life. Counsel, for the various claims that you made, what's actually before us on appeal? Are all of the claims, or are you raising and seeking reversal on a portion of the judgment? All of the claims-ish. The claim for summary judgment as to the city is, as the city of Grand Island is, is in a difficult posture at this point. The district court had granted the motion for summary judgment as to the city on our claims of failure to train and policy and custom. However, what we learned during the appeal was that one of the important deposition transcripts that had the data as to, or the information, the evidence as to the city, was not included in the summary judgment evidence index due to a filing error. And so if this Court finds that, finds that the summary judgment as to the dispatcher should be reversed, we would ask the Court to also vacate the order of summary judgment as to the city, since through this error, the evidence that would have opposed summary judgment on failure to train and failure in policy and custom just was not in the record for the Court's review. So the principal focus on this appeal are the, as to the dispatchers? Correct. Yes, Judge Smith. So DeShaney talks about private violence. We don't have private violence here. What's your best case that DeShaney even applies before we get to the unconscionable issue that the district court worked with? I mean, if you're in the, if this case was in the Tenth Circuit, you'd lose immediately, right?  Well, I thought you'd lose immediately. Hasn't the Tenth Circuit in Moore v. Guthrie said that the state created danger doctrine, or the danger creation doctrine does not apply when the injury occurs due to the action of another state actor? And here we have police officers. I'm just not convinced, I mean, I'm offering you the opportunity to convince me that the doctrine even applies here. Judge Kobus, the Tenth Circuit, and I'm not withstanding my joke, because the Tenth Circuit has an awful lot of authority on this. I recognize the Moore v. Guthrie case. The Tenth Circuit also has a case that's called J.M. Exwell Morris v. Hillsdale Independent School District. And that was the case against a school district. A school district that knowingly had allowed one of its teachers to pursue a sexual relationship with a student. That case went to trial. The trial resulted in a verdict against the school district. And on appeal to the Tenth, the defense said that state created danger should not apply because the teacher who had had this relationship with a student was also a state actor. What the Tenth Circuit replied was that in that state actor. And that would be my argument here as well. How is the officer like a third party and not a state actor? I assume that's what you were just going to say, but... It's where I'm going. This, the fact that these are actors of two different agents, there's a couple answers to this. And one begins with the fact that the police officer is from a different agency, different training, different mission, different policies and procedures. They're both public safety agencies, correct? I'm sorry? They're both public safety agencies that work together in order to respond to the sort of phone call that came in this case. That's accurate. Although, you know, taken to an extreme, that argument could apply to an awful lot of different government agencies and say that they are all, you know, roads and bridges are all concerned with public safety as well. We had... He was responding to 911 calls. The 911 operator takes the call, forwards it to the police officer who responds. That's not roads and bridges. That's... You're correct, Your Honor. Of course you are, but your point is taken. He was responding. However, this is a case in which the officer did nothing wrong. And fortuitously, it could have been a neighbor that went to the steps. It could have been anybody else that went up and knocked on Ben Melendez's door in that state of agitation that he was put into. He did nothing wrong. He defended himself reasonably under the circumstances. And I think that point is worth noting. We are not alleging any kind of wrongdoing or either State or constitutional tort against the officer who responded here, Judge Kobus. This is a scenario in which one State actor enhanced or created danger, and then the officer from a different agency, doing nothing wrong, brought that danger into manifestation. But the officer did not commit some independent constitutional tort. This isn't a situation as if, for example, if two officers both approached Ben, one provoked him and then the second one assaulted him. This is a different situation where you have different agencies, different missions, and the second officer, the second government employee, his role in the outcome was tragic and also fortuitous. Counsel, could you describe what you might consider a quintessential scenario of the application of this doctrine of created danger? I'm sort of smiling at you, Judge Smith, because the quintessential argument, the quintessential scenario to me in my bias is one that the U.S. Supreme Court had ruled in favor of the government on, which would be the Gonzalez v. Castle Rock case, where there was knowledge by the police that there was danger to these children of their noncustodial father. The U.S. Supreme Court disagrees with me on that. I understand that a lot of courts do. But this, it is a, the quintessential situation would be, would be a, you know, a situation in which the danger that this person might face, that the victim, ultimate victim might face, could be fortuitous, you know, is, is greater because of... And the reason I ask the question is I'm trying to fit the fact scenario of this case to the principles of this doctrine and whether or not this is an appropriate use of that and where you have a situation, as you described, where the actions of the officers, of the officer was self-defense. It, it wasn't, the officer wasn't there to harm. The officer wasn't a criminal trying to, to do harm that, that 911 operator put in the path of the, of the decedent. It, it just seems that I'm, I'm, I'm trying to make the facts of this case fit what this legal concept applies to. One that comes close-ish would be the Freeman v. Ferguson case from this, from this circuit. And there's differences. I recognize that. Freeman was a case in which this Court had received the case on appeal from a 12B6 motion, not on summary judgment. But it was a situation in which, in which the police had, had done something that interfered with the ultimate victim's ability to get help. In this case, what the dispatchers did in affirmatively provoking Ben Melendez, this is a case in which the dispatchers did not get help. He should have called if he, calling 911 should not have resulted in him getting provoked and more angry and more spun up and more agitated. Is there, is there evidence, I mean, provoked, is there evidence he got more spun up? I mean, I, I, I listened to those, obviously difficult to listen to when you know what ended up happening. But he seemed fairly, I mean, he seemed fairly upset the entire phone call. I mean, is it clear in the record that he became more upset as a result of these calls? I think the fact that there were continuing calls matters on that, Judge Kobus. He called obviously upset to begin with. Over the course of call number one, he gets agitated, he yells the threat, step on my porch and you're dead, and he hangs up the  phone. But that's your main focus, is call number one. Call number one and it didn't. Call number one was, the interchange was without, if call number one had been call number two and it was the same dispatcher and they were within ten minutes of each other, it's a different case. Probably, Your Honor. He, the fact that the calls continued is what I'm focusing on, Judge Logan. I don't know, but it seems they didn't connect. Sort of along Judge Smith's line, this case at the outset reminded me of a couple of dispatcher cases that I've been on the panel. Now, typically they're deliberate indifference of medical need, serious medical need, Eighth Amendment cases. But the dispatcher's role is about the same and we have not had claims against dispatchers with any, those claims have not prevailed. Consistently. Consistently. How is this different? I don't. To me, although yes, it's a different constitutional claim and so forth, to me they're almost on all fours. Judge Logan, I may be forgetting, I don't think I've found any state-created danger cases regarding dispatchers in this district. I know that there was . . . It's a different way to argue the same thing, except substantive due process is much more difficult to prevail on than the Fourth Amendment or the Eighth Amendment. I didn't want to make it easy on myself, after all. Well, the one thing that shocks the conscience is the standard in the Eighth Circuit. Correct. And you can argue that it shouldn't be anymore or that the Supreme Court maybe is going somewhere else. But I've read those shocks to conscience cases and I know we held in the St. Louis police chief case, Moran, anyway, that that's the standard in the Eighth Circuit. And I don't find this conscience shocking. The fact that the dispatcher in the first phone call got in an argument with an irate phone caller . . . Well, he wasn't . . . . . . and got a little angry, good grief, that doesn't . . . certainly doesn't shock . . . I mean, that wouldn't shock anybody's conscience. And the fact that after the second call, I think it was, he turned to a colleague and said the guy's nuts, well, that's almost not to be expected but very predictable. It did shock the conscience of our expert witness who had worked . . . Of what? Our expert witness who has worked in public safety communication since 1970. She was . . . Well, I'm going to . . . . . . appalled by that. And . . . He's not a Supreme Court justice. No, she isn't. And what stood out to me was the fact that, you know, in contrast to other dispatcher cases, other dispatchers don't fight with mentally ill callers or even non-mentally ill callers. I mean, fighting with. Yeah, what do you mean fighting with? I mean, there was frustration and resistance and fighting with, I don't know. There was argument with, there was resistance, there was . . . even Mr. Kelly himself acknowledged that he didn't handle that call very well. All of his supervisors said the same thing. You know, and I think that's quite clear that it wasn't handled well, but that's . . . the bar is much higher than that, I think. It is. Your Honor, may I answer your question? I'm out of time, but I don't want to just flee. As long as it's okay with Judge Logan. Go ahead. Thank you, Your Honor. I have a different view of, you know, from Your Honors, and I respect that. I acknowledge that. To my listening, we had a caller who became much more agitated and then continued to call as the 911 center, somebody there, called him back, which increased his paranoia, increased his agitation, and then by the third call, at that point, now he's screaming, you know, step up to my porch or if you knock on my door, I'm stabbing you in the eye. To me, that was the escalation and the signs of agitation increasing, Judge Kobus. Thank you. Thank you, Your Honors. Thank you for hearing our argument in this case. Mr. Schmidt. May it please the Court, I'm Chris Schmidt, appearing on behalf of the appellees, the City of Grand Island, Brandon Kelly, and Grady Higgins, each of whom were dismissed in the district court's well-reasoned order that should be affirmed. And I want to begin by noting something that's come up already, which is that at its core, this case is about an officer-involved shooting. This case is about an officer-involved shooting, and we've talked about how trying to make the facts fit to the theory espoused by the estate, and I think the struggle comes in that we have a constitutional provision with its own framework designed specifically to deal with officer-involved shootings. That's the Fourth Amendment to the United States Constitution and its objective reasonableness standard. And the estate, I appreciate that they concede that the officer here did not violate Mr. Melendez's Fourth Amendment rights. He fired the shot after he was stabbed by Mr. Melendez. Instead, what the estate does is try to repackage I don't have much trouble conjuring up a deliberate indifference claim against a dispatcher whose deliberate indifference caused the officer to be in a position where he would predictably have to defend himself. Sure. So I'll take that in two directions, Judge Loken. First is that, as Judge Kobus introduced, this idea that harm inflicted by a public actor generally cannot support a state-created danger theory. And we focused What? Harm inflicted by a public actor, like a police officer, cannot support a state-created danger theory. We mentioned the Tenth Circuit. Now we're back to the claim pleaded and not your Fourth Amendment. This had to be Fourth Amendment. I understand, Judge. The fact You flip-flopped there and I'm trying to keep up. Okay. So that is one thing held not only by the Tenth Circuit, but also the Seventh Circuit. And those cases are not outliers, but rather a broad consensus that's been echoed across many cases and rejected by none. But then, Judge Loken, to respond to your question more directly, I would say, if you are unconvinced by the idea that the state-created danger theory cannot apply when a police officer fires the shot, so to speak, then we come to conscious shocking standard that was also discussed with Ms. Chalupka. And that standard is very, very high. And here we have a recording that everybody can listen to. And it's easy to look back and question how things might have gone differently or how Brandon Kelly or Grady Higgins could have handled the call or maybe even should have handled the call. But that is not what courts do, particularly with the benefit of hindsight. Instead, they ask, was it shocking to the conscience? And there's some question about what standard exactly applies. Typically, the presumptive standard is proof of intent to harm. Other times, when there's actual time to deliberate, which we would contend is lacking here, the standard is still deliberate indifference and criminal recklessness, which just does not arise or reveal itself from those caller recordings. Why isn't this deliberate indifference? What does the record show about the dispatcher's information about who was on the other end of the phone with them? Well, Judge, they knew very little is the answer to begin with. They did not know where exactly the call was coming from. They were met, Mr. Kelly, the first call. There was something in the record, though, right, that they had received a call from a nearby address earlier. What was that? Yes. Mr. Melendez had multiple encounters with members of the city. That's what I'm wondering. I mean, is it fair to impute that they knew or should have known who was on the other end of the phone and what the situation was likely to end up as? I think that is difficult in a high standard to hold dispatchers to in the context of a 72nd call, which is how long Mr. Kelly interacted with Mr. Melendez the first go. And then I would also add that Mr. Kelly did supplement the dispatch reports by saying last month there was a call from an individual with reports of hallucination, yelling, and things like that. And so that past history as to who this might be was communicated by the dispatchers to the responding officers. And I would also add that the officers who did, in fact, respond that first time, for which there was no response by Mr. Melendez, they informed one another, wasn't he 1090 once, which means mental illness? He said there was no response. They showed up and he didn't answer the door.  Correct, Judge. And then furthermore. What brought them back the second time? I'm sorry. What brought the officers back to the house the second time? A second, or technically a third call brought them back again. From who? From Mr. Melendez. And so the officers actually communicated with one another as well. I think something to the effect of I think this is, I know who this is, didn't he attack officers once? And so the officers responding to a disturbance, which is a high-priority call that Mr. Kelly attached that designation to, knew that it was a high-priority call with unknown factors coming from a home, a residence, where they had responded to a hallucinating individual previously who they believed had attacked officers on one prior occasion. It seems an important fact in this case is whether or not the 911 operator had a responsibility to communicate the threat that Melendez made about someone showing up. Yes, Judge. And that hearkens to a separate requirement that we contend is lacking here, which is the state-created danger theory can only consist of affirmative conduct, action, not inaction. And when the few courts who have grappled with this theory in the context of dispatchers have consistently found that lacking. And so failing to include information is just not enough. That is not affirmative conduct that can support a state-created danger theory as the Third Circuit recognized in Johnson or the Sixth Circuit in May. That is inaction. Failing to provide a verbatim transcript of the threat is inaction, not affirmative conduct of the type required to support a state-created danger theory. It's not hard to imagine scenarios, though, where the omission can be so dramatic in its impact that it's tantamount to a chosen act. I might not disagree with you, Judge, from a normative perspective or what the law should be, but in terms of what the law is, which is most relevant particularly. We don't have any law. Correct. But that segues to qualified immunity and the need for clearly established law. And so I would also note that, Judge Loken, you hearkened to the fact that we are focusing primarily on this first call, which yielded no response by Mr. Melendez and the officers left. And on the third call with the second dispatcher, he let Mr. Melendez speak and did not provoke, fight with, or whatever verb you would like to use with Mr. Melendez. He sat and listened and then dispatched the officers saying that this man, this male caller, called again and said something about bringing a knife out and stabbing someone in the yard. And he's nuts. And that he's nuts, but it is too far a leap to get from there to proof of intent to harm or deliberate indifference as to safety. He included information informing the officers of a threat, even if it was not verbatim, and that does not shock the conscience. It does not represent a brutal and inhumane abuse of official authority. I'd like to circle back to the qualified immunity issue that I raised just a minute ago. There was a question, Judge Smith, you asked what issues are actually on appeal here, and certainly we have the dispatchers front and center, and so qualified immunity is squarely in play. The claim against John Rosenblum, the Director of Emergency Management, has not been appealed. And then as to the city, I would submit that there is evidence in the record, which this Court can look at. I would look to saying that there has not been a single prior incidence, let alone a pattern that evidences a non-constitutional policy, practice, or custom. So with qualified immunity, we need a case that's squarely governed or a robust consensus of cases. Well, don't overstate it. We've been careful to say so is the Supreme Court. Squarely governed does not mean on all fours. It does not, Judge. There are a multitude of cases that we believe cite our cases, and if they are not on all fours, are very close. And so we can talk about ways in which Mr. Chalupka tries to distinguish those cases. But on the other hand, we can't invert the qualified immunity analysis. There needs to be some case or doctrinal authority that we can point to supporting liability. And I frankly am not aware of any that I can even try and distinguish from in a meaningful way. You look at circuit-level opinions from the Tenth Circuit, the Seventh Circuit, the Sixth Circuit, the Third Circuit. It seems to me if we get there, we've got to remand to sort out the various defendants. Can you elaborate, Judge? Well, you're jumping around between the city and the individual officers, and now we're talking about clearly established, and that's a different issue. You've got to have an individualized analysis. I didn't really see that. So we're painting with a very broad brush here that's very dangerous. Understood, Judge. The quantity of cases like this that we see. And part of that individualized analysis piece might come from the fact that the district court decided this case solely based upon its conclusion there was no constitutional violation. Well, that's right. I'm not sure that if that's wrong, it seems to me we have to remand on qualified immunity anyway. Period. Qualified immunity is a question of law. I believe this court could address in the first instance on appeal. Well, but the city doesn't get qualified immunity. Correct. But the court can look to the absence of any single incident, let alone a pattern of similar conduct alleged to violate the Constitution. Well, it doesn't have to be a pattern either. It can also be a decision-maker under county of whatever versus Brown. And I would submit that there is just no official city action here when we're dealing with individual dispatcher interactions that span three minutes. But if there are multiple ways this court could decide the case and affirm the district court without reaching qualified immunity, I don't mean to intend or convey that that is necessary. The court could agree with the district court that this conduct is simply not conscious shocking. It could rule that the state-created danger theory is, in fact, viable. It just does not apply when the harm is inflicted by a state actor. It could find that there was no affirmative conduct since the primary grievance alleged is the alleged failure to convey sufficient information. All of those would mean that there is no constitutional violation and that is the end of the story. If there are no other questions. Thank you. Thank you. I think we understand the case, but I'll give you a minute if you think that would... I'll waive that, Your Honor. Pardon? I said I will waive that and thank you. Well, very good.